1   Ben F. Pierce Gore (SBN 128515)
    PRATT & ASSOCIATES
2   1871 The Alameda, Suite 425
    San Jose, CA 95126
3   Telephone: (408) 429-6506
    Fax: (408) 369-0752
4   pgore@prattattorneys.com

5   *Attorney for Plaintiff*

6                   UNITED STATES DISTRICT COURT

7              NORTHERN DISTRICT OF CALIFORNIA

8                       SAN JOSE DIVISION

9
    WILLIAM AVILES HARDWOOD FLOORS,        Case No.
10  individually and on behalf of all others   CV 14-00114   HRL
    similarly situated,
11                                           **CLASS ACTION AND
                Plaintiff,                    REPRESENTATIVE ACTION
12                                            COMPLAINT FOR DAMAGES,
    v.                                        EQUITABLE AND INJUNCTIVE
13                                            RELIEF**
    JTEKT CORPORATION, KOYO
14  CORPORATION OF U.S.A., NACHI-
    FUJIKOSHI CORP., NACHI AMERICA          **JURY TRIAL DEMANDED**
15  INC., NSK LTD., NSK AMERICAS, INC.,
    SCHAEFFLER AG, SCHAEFFLER GROUP
16  USA INC., AB SKF, SKF USA, INC., NTN
    CORPORATION, and NTN USA
17  CORPORATION,

18              Defendants.

19

20       William Aviles Hardwood Floors ("Plaintiff") files this Class Action Complaint on behalf

21  of itself and all others similarly situated (the "Classes," as defined below).  Plaintiff brings this

22  class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and

23  state antitrust, unfair competition, and consumer protection laws, demands a trial by jury, and

24  alleges as follows:

25

26                              **NATURE OF THE ACTION**

27       1.      Plaintiff brings this lawsuit as a proposed class action against the Defendants

28  (defined below), manufacturers, and suppliers of industrial machinery bearings (defined below)

    CLASS ACTION COMPLAINT

1 globally and in the United States for engaging in a lengthy conspiracy to suppress and eliminate

2 competition in the bearings industry by agreeing to fix, stabilize, and maintain the prices of these

3 products, which were sold to manufacturers in the United States and elsewhere. "Bearings" refers

4 to industrial machinery bearings. Examples include, but are not limited to, the following products:

5 ball bearings, tapered roller bearings, roller bearings, and mounted bearings. For purposes of this

6 proceeding, "Bearings" does **not** include automobile bearings installed in vehicles.

7       2.     The "Class Period" refers to January 1, 2000 to the present.

8       3.     The Defendants manufacture, market, and sell Bearings throughout the United

9 States and in other countries.

10       4.     Industrial machinery containing Bearings, as well as Bearings themselves, made

11 by Defendants, are sold in every state of the United States and the District of Columbia.

12       5.     The Defendants and other co-conspirators (as yet unknown) agreed, combined, and

13 conspired to fix, stabilize, and maintain the prices of Bearings. They carried out their conspiracy

14 by agreeing, during meetings and conversations, to fix the prices of Bearings. Defendants then

15 sold Bearings at noncompetitive prices to manufacturers in the United States and elsewhere, for

16 sale in the United States.

17       6.     Defendants' anticompetitive conduct is also the subject of a global criminal

18 investigation.

19       7.     As part of its criminal investigation, the United States Department of Justice (the

20 "DOJ") is seeking information about anticompetitive conduct in the market for bearings, and the

21 Federal Bureau of Investigation (the "FBI") has participated in raids, pursuant to search warrants,

22 carried out in at least some of the Defendants' offices in connection with a probe into the bearings

23 industry. The European Commission Competition Authority (the "EC") has also conducted dawn

24 raids at the European offices of several of the Defendants.

25       8.     The Japan Fair Trade Commission (the "JFTC") began its investigation in July

26 2011 after JTEKT Corporation reported the cartel to the JFTC so that it would be given leniency

27 treatment. Officials of NSK Ltd. and Nachi-Fujikoshi Corp. have also admitted their roles in the

28 cartel and, according to recent news reports, some NTN Corporation officials have made

CLASS ACTION COMPLAINT                                    2

1 statements, during voluntary questioning with Tokyo prosecutors, admitting their involvement in

2 fixing prices for Bearings.

3      9.    On June 14, 2012, the JFTC filed a criminal accusation alleging a criminal

4 violation of Japan's Antimonopoly Act against NSK Ltd, NTN Corp., and Nachi-Fujikoshi Corp.

5     10.    On December 28, 2012, Nachi-Fujikoshi Corp. and two of its executives were

6 convicted in Tokyo District Court of violating Japan's Antimonopoly Act.

7     11.    On February 25, 2013, Defendant NSK Ltd. announced that the company was

8 sentenced to a penalty of 380 million yen by the Tokyo District Court for violation of the

9 Antimonopoly Act of Japan regarding sales of Bearings as a result of the June 14, 2012

10 prosecution by the Tokyo District Public Prosecutors Office. In addition, two of NSK's former

11 officers and a former employee received suspended sentences.

12     12.    On March 29, 2013, the JFTC issued cease and desist orders and surcharge

13 payment orders based on violations of the Japan Antimonopoly Act against NTN Corp., NSK

14 Ltd., and Nachi-Fujikoshi Corp. It also noted that JTEKT Corp. had violated the Antimonopoly

15 Act through its participation in the conspiracy, but was not subject to the cease and desist order.

16     13.    JTEKT Corporation has also pleaded guilty in Canada to engaging in

17 anticompetitive conduct, in violation of Canadian competition laws.

18     14.    As a direct result of the anti-competitive and unlawful conduct alleged herein,

19 Plaintiff and the Class paid artificially inflated prices for Bearings and for industrial machinery

20 containing Bearings. Plaintiff and the members of the Classes have thereby suffered antitrust

21 injury to their business or property.

22                 **JURISDICTION AND VENUE**

23     15.    Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to

24 secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman

25 Act (15 U.S.C. § 1). Plaintiff also asserts claims for actual and exemplary damages pursuant to

26 state antitrust, unfair competition, and consumer protection laws, and seeks to obtain restitution,

27 recover damages, and secure other relief against Defendants for violation of those state laws.

28

CLASS ACTION COMPLAINT

1  Plaintiff and the Classes also seek attorneys' fees, costs, and other expenses under federal and
2  state law.

3      16.    This Court has jurisdiction over the subject matter of this action pursuant to
4  Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1),
5  and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter
6  jurisdiction over the state law claims in this action, pursuant to 28 U.S.C. §§ 1332(d) and 1367,
7  because this is a class action in which the matter or controversy exceeds the sum of $5,000,000,
8  exclusive of interests and costs, and in which some members of the proposed Classes are citizens of
9  different states than some Defendants.

10     17.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15
11  U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events
12  giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected
13  interstate trade and commerce discussed below has been carried out in this district, and one or more
14  of the Defendants are licensed to do business in, are doing business in, had agents in, or are found
15  or transact business in this District.

16     18.    This Court has *in personam* jurisdiction over each of the Defendants because each
17  Defendant, either directly or through the ownership and/or control of its United States
18  subsidiaries, *inter alia:* (a) transacted business in the United States, including in this District; (b)
19  directly or indirectly sold or marketed substantial quantities of Bearings throughout the United
20  States that were specifically designed for industrial machinery that was intended to be sold in the
21  United States, including in this District; (c) had substantial aggregate contacts with the United
22  States as a whole, including in this District; (d) was through its own actions and through the
23  actions of its co-conspirators, engaged in an illegal price-fixing conspiracy that was directed at,
24  and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the
25  business or property of persons and entities residing in, located in, or doing business throughout
26  the United States; (e) targeted customers in the United States, including this District, and/or (f)
27  engaged in actions in furtherance of an illegal conspiracy in this District either itself or through its
28  co-conspirators.  Defendants also conduct business throughout the United States, including in this

CLASS ACTION COMPLAINT                                                    4

1   District, and they have purposefully availed themselves of the laws of the United States and this

2   District.

3       19.     Defendants engaged in conduct both inside and outside of the United States that

4   caused direct, substantial, reasonably foreseeable, and intended anti-competitive effects upon

5   interstate commerce within the United States and upon import trade and commerce into the

6   United States.

7       20.     The activities of Defendants and their co-conspirators were within the flow of,

8   were intended to have, and did have, a substantial effect on interstate commerce of the United

9   States. Defendants' products are sold in the flow of interstate commerce.

10      21.     Bearings manufactured abroad by Defendants and sold for use in industrial

11  machinery either manufactured in the United States or manufactured abroad and sold in the

12  United States are goods brought into the United States for sale and, therefore, constitute import

13  commerce. To the extent any Bearings are purchased in the United States, and such Bearings do

14  not constitute import commerce, Defendants' unlawful activities with respect thereto, as more

15  fully alleged herein during the Class Period, had, and continue to have, a direct, substantial, and

16  reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its

17  effect on United States commerce described herein, proximately caused antitrust injury to

18  Plaintiff and members of the Classes in the United States.

19      22.     By reason of the unlawful activities hereinafter alleged, Defendants substantially

20  affected commerce throughout the United States, causing injury to Plaintiff and members of the

21  Classes. Defendants, directly and through their agents, engaged in activities affecting all states, to

22  fix or inflate prices of Bearings, and that conspiracy unreasonably restrained trade and adversely

23  affected the market for Bearings.

24      23.     Defendants' conspiracy and wrongdoing described herein adversely affected

25  persons in the United States who purchased Bearings, including Plaintiff and the Classes.

26  //

27  //

28  //

**PARTIES**

**The Plaintiff**

24. Plaintiff William Aviles Hardwood Floors is a California sole proprietorship owned by William Aviles, with its principal place of business in Morgan Hill, California. Plaintiff William Aviles Hardwood Floors bought industrial machinery containing Bearings manufactured by one or more Defendants or their co-conspirators, as well as Bearings manufactured by one or more Defendants or their co-conspirators.

25. During the Class Period Plaintiff William Aviles Hardwood Floors purchased industrial machinery containing Bearings manufactured by one or more Defendants or their co-conspirators. Plaintiff William Aviles Hardwood Floors also purchased Bearings, manufactured by one or more Defendants or their co-conspirators for its service business, during the Class Period. Plaintiff William Aviles Hardwood Floors purchased and received both the afore-mentioned industrial machinery and Bearings in California. Plaintiff William Aviles Hardwood Floors has also conducted its business in California during the Class Period.

**The Defendants**

26. Defendant JTEKT Corporation ("JTEKT Corporation") is a Japanese corporation with its principal place of business in Osaka, Japan. JTEKT — directly and/or through its wholly owned and/or controlled subsidiaries — manufactured, marketed and/or sold Bearings that were purchased throughout the United States, including in this District, during the Class Period.

27. Defendant Koyo Corporation of U.S.A. ("Koyo") is a South Carolina corporation with its principal place of business in Westlake, Ohio. It is a subsidiary of, and wholly-owned or controlled by, its parent, JTEKT. Defendant Koyo manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this District, during the Class Period, including by firms that sold such Bearings to Plaintiff and class members. During the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

28.     JTEKT and Koyo also share and have shared numerous executives.   Hiroyuki Miyazaki, an executive director at JTEKT is also a Director at Koyo. Noriya Murase, a Senior Executive Director at JTEKT is the former President and Chief Executive Officer of Koyo.

29.     The message from the Chairman and President at the beginning of JTEKT's 2012 Annual report describes the economic situation in markets targeted by the company.  It states "there was underlying strength in the U.S. economy, as evidenced by the improved employment situation there."

30.     Defendants Koyo and JTEKT Corporation are collectively referred to as "JTEKT."

31.     Defendant Nachi-Fujikoshi Corp. ("Nachi-Fujikoshi") is a Japanese corporation with its principal place of business in Toyama, Japan. Nachi-Fujikoshi directly and/or through its wholly owned and/or controlled subsidiaries — manufactured, marketed and/or sold Bearings that were purchased throughout the United States, including in this District, during the Class Period.

32.     Defendant Nachi America Inc. ("Nachi America") is an Indiana corporation with its principal place of business in Greenwood, Indiana. It is a subsidiary of, and wholly-owned or controlled by, its parent, Nachi-Fujikoshi. Defendant Nachi America manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this District, during the Class Period, including by firms that sold such Bearings to Plaintiff and class members. During the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

33.     Nachi America and Nachi-Fujikoshi also share and have shared numerous executives.  Toru Inoue, a corporate officer at Nachi-Fujikoshi, is listed in its 2013 Company Profile as the President of Nachi America Inc., and "[i]n Charge of North & Central America." Nobuo Segawa, a former director at Nachi-Fujikoshi is also a former President of Nachi America. Makoto Sasaki, a Managing Director and General Manager of Sales Strategy of Nachi-Fujikoshi is the former Chairman of the Board of Nachi America.

34.     Nachi America is referred to in Nachi-Fujikoshi's 2013 Annual Report as one of its "Sales Offices." Nachi-Fujikoshi's 2013 report also states that one of its management policies is "creating markets in Japan, Europe, and the USA as new volume zones." Nachi's company

1  profile indicates that it has been "marketing with large OEM customers . . . in America" since
2  1955.

3      35.    Defendants Nachi America and Nachi-Fujikoshi are collectively referred to as
4  "Nachi."

5      36.    Defendant NSK Ltd. ("NSK Ltd.") is a Japanese corporation with its principal
6  place of business in Tokyo, Japan. NSK— directly and/or through its wholly owned and/or
7  controlled subsidiaries—manufactured, marketed and/or sold Bearings that were purchased
8  throughout the United States, including in this District, during the Class Period.

9      37.    Defendant NSK Americas, Inc. ("NSK Americas") is a Delaware corporation with
10  its principal place of business in Ann Arbor, Michigan. It is a subsidiary of, and wholly-owned or
11  controlled by, its parent, NSK. Defendant NSK Americas manufactured, marketed and/or sold
12  Bearings that were purchased in the United States, including in this District, during the Class
13  Period, including by firms that sold such Bearings to Plaintiff and class members. During the
14  Class Period, its activities in the United States were under the control and direction of its Japanese
15  parent, which controlled its policies, sales, and finances.

16      38.    NSK Ltd.'s annual report sets forth aggregate financials for all of the NSK entities.
17  Sales are reported by the sectors the entities supply, rather than by subsidiary.

18      39.    NSK's 2008 report describes its performance in each of its markets. In doing so it
19  sets forth one reason for decreased sales in the U.S. "demand in the U.S. for minivans declined,
20  and total sales was flat in the Americas, year-on-year." That report also lists one of NSK's
21  concerns as "a weak U.S. dollar."

22      40.    NSK Ltd. and NSK Americas have also shared numerous executives. Bernard
23  Lindsay served as COO for NSK Americas and then as Chief Executive Officer, CEO, and Vice
24  President of NSK Ltd. Masahide Matsubara, a senior Vice President at NSK, Ltd., is the former
25  Chief Executive Officer of NSK Americas.

26      41.    Defendants NSK Ltd. and NSK Americas are collectively referred to as "NSK."

27      42.    Defendant Schaeffler AG is a German corporation with its principal place of
28  business in Herzogenaurach, Germany. Schaeffler — directly and/or through its wholly owned

CLASS ACTION COMPLAINT                                                                    8

and/or controlled subsidiaries — manufactured, marketed and/or sold Bearings that were purchased throughout the United States, including in this District, during the Class Period.

43.    Defendant Schaeffler Group USA Inc. ("Schaeffler Group USA") is a Delaware corporation with its principal place of business in Fort Mill, South Carolina. It is a subsidiary of, and wholly-owned or controlled by, its parent, Schaeffler AG. Defendant Schaeffler Group USA manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this District, during the Class Period, including by firms that sold such Bearings to Plaintiff and class members. During the Class Period, its activities in the United States were under the control and direction of its German parent, which controlled its policies, sales, and finances.

44.    Schaeffler Group USA Inc. is described on the Schaeffler website as one of Schaeffeler's "Worldwide Locations."

45.    Schaeffler AG's Q1 Report describes one of the "primary dampers of economic growth" as "the restrictive spending policy in the U.S."

46.    Schaeffler Group USA and Schaeffler AG have shared numerous executives. Klaus Rosenfeld, the Chief Financial Officer and Member of the Executive Manager Board of Schaeffler AG, is also the Chief Financial Officer of Schaeffler Group USA. Dr. Jürgen M. Geissenger is the CEO of both Schaeffler Group USA and Schaeffler AG. Georg F.W. Schaeffler is a Board Member at both Schaeffler AG and Schaeffler Group USA.

47.    Defendants Schaeffler Group USA and Schaeffler AG are collectively referred to as "Schaeffler."

48.    Defendant AB SKF is a Swedish corporation with its principal place of business in Goteborg, Sweden. SKF directly and/or through its wholly owned and/or controlled subsidiaries—manufactured, marketed and/or sold Bearings that were purchased throughout the United States, including in this District, during the Class Period.

49.    Defendant SKF USA, Inc. ("SKF USA") is a Delaware corporation with its principal place of business in Lansdale, Pennsylvania. It is a subsidiary of, and wholly-owned or controlled by, its parent, AB SKF. Defendant SKF USA manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this District, during the Class

CLASS ACTION COMPLAINT

Period, including by firms that sold such Bearings to Plaintiff and class members. During the Class Period, its activities in the United States were under the control and direction of its Swedish parent, which controlled its policies, sales, and finances.

50. AB SKF and SKF USA have also shared numerous executives. Tom Johnstone, the Chief Executive Officer and President at SKF AB also served as Co-President and Chief Executive Officer as well as a Director at SKF USA Inc. Henrik Lange, the Executive Vice President and Chief Financial Officer of AB SKF, previously served as President of the Industrial Division at SKF USA Inc. Poul Jeppesen, the Chief Executive Officer and President of USA Operations at AB SKF is also the Chief Executive Officer of SKF USA.

51. SKF reports its sales by business segment, rather than by subsidiary.

52. SKF's 2012 report states that "180 SKF distributors took part in the North American Distributor Convention held in Florida." It states later in the report that it held conventions for distributors in North America, so that they could learn more about SKF's products. SKF's 2012 report also states that "demand continued to be good in both North and Latin America." In addition, the report states that in 2008, SKF acquired PEER Bearings Company, whose "main market" is North America. The report also mentioned that its anti-counterfeiting campaigns are starting to show results in North America.

53. SKF has an enormous presence in the United States. Approximately 28 of its 140 manufacturing facilities are located in the United States. An average of 5247 persons, or 11.8% of the Group's workforce, were employed in the United States. With respect to SKF as a whole, in 2012, 20% of its sales were made in the USA. With respect to the Automotive Division, in 2012, 19% of its sales were in North America.

54. Defendants AB SKF and SKF USA are collectively referred to as "SKF."

55. Defendant NTN Corporation is a Japanese corporation with its principal place of business in Osaka, Japan. NTN Corporation — directly and/or through its wholly owned and/or controlled subsidiaries — manufactured, marketed and/or sold Bearings that were purchased throughout the United States, including in this District, during the Class Period.

CLASS ACTION COMPLAINT

10

56. Defendant NTN USA Corporation is a Delaware corporation with its principal place of business in Mount Prospect, Illinois. NTN USA Corporation manufactured, marketed and/or sold Bearings that were purchased in the United States, including in this District, during the Class Period, including by firms that sold such Bearings to Plaintiff and class members. During the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

57. NTN Corporation and NTN USA have shared a number of executives. For instance, Tadatoshi Kato, the president of NTN USA is a former Managing Director and Senior Managing Director of NTN Corporation. Yasunobu Suzuki, the Chairman of the Board and Representative Director at NTN Corporation is the former Chairman of NTN USA.

58. NTN USA Corp. does not have its own website. Rather its website is listed on NTN Corporation's website as "NTNAmericas.com." The homepage of that website indicates that any American entities view themselves as NTN Corporation, their Japanese parent, and not as separate entities. The website states of "NTN Americas" that "[a]s the world's third largest bearing manufacturer, we have over 68 plants worldwide and nearly 100 years of premium quality to our name."

59. In a "Q&A" feature in its 2012 report, NTN, in answer to the question "what is your strategy for industrialized countries in Europe and the Americas" states "we will focus on developing and producing high-value-added products."

60. Defendants NTN Corporation and NTN USA Corporation are collectively referred to as "NTN."

### AGENTS AND CO-CONSPIRATORS

61. Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged.

62. Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this

1    Complaint, and have performed acts and made statements in furtherance of the conspiracy or in

2    furtherance of the anti-competitive conduct.

3          63.     Whenever in this Complaint reference is made to any act, deed, or transaction of

4    any corporation or limited liability entity, the allegation means that the corporation or limited

5    liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents,

6    employees, or representatives while they were actively engaged in the management, direction,

7    control, or transaction of the corporation's or limited liability entity's business or affairs.

8                            **FACTUAL ALLEGATIONS**

9       A.     **The Bearings Industry**

10         64.     Bearings are friction-reducing devices that allow one moving part to glide past

11    another moving part. Rolling bearings include both ball bearings and roller bearings.

12         65.     Ball bearings, also known as anti-friction bearings, are the most common type of

13    bearing and are small metallic or ceramic spheres used to reduce friction between axles and shafts

14    in numerous applications. Ball bearings are often used in individual cages to reduce friction in

15    axle assemblies or in a series to absorb the weight placed on a moving part. Ball bearings are

16    commonly found in fans, roller blades, and wheel bearings. *See* Figure. 1



**Figure 1**

66.     Roller bearings, unlike ball bearings, use cylinders instead of spheres. Therefore, the load is spread over a larger area enabling the bearing to handle greater loads than ball bearings. Roller bearings include spherical roller bearings, needle roller bearings, cylindrical roller bearings, thrust roller bearings, and tapered roller bearings.

67.     Tapered roller bearings are the second most popular bearing type, with only deep groove ball bearings more common. Tapered roller bearings are generally found in heavy industrial and wheel applications with combined radial and axial loads. Some examples are gearboxes, power generation and other process equipment. These bearings use conical rollers that run on conical races. Unlike other roller bearings, they support both radial and axial loads, and are able to carry higher loads. The conical geometry of tapered roller bearings provides a larger contact patch, which allows greater loads to be carried as compared to spherical (ball) bearings. *See* Figure. 2



**Figure 2**

68.     The global Bearings market is generally viewed as the worldwide sales of rolling bearings, which consist of ball and roller bearings.

69.     Bearings are sometimes installed in new industrial machinery by original equipment manufacturers ("OEMs") in new machinery as part of the manufacturing process. They are also installed in machinery to replace worn out, defective or damaged Bearings.

70.     Defendants and their co-conspirators supplied bearings to OEMs for installation in industrial machinery manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Bearings (a) in the United States for installation in industrial machinery manufactured and sold in the United States, (b) abroad for export to the United States and installation in industrial machinery manufactured and sold in the United States, and (c) abroad for installation in industrial machinery manufactured abroad for export to and sale in the United States.

71.     Suppliers, including Defendants, supply OEMs with both Bearings to be installed in industrial machinery and Bearings to be used for replacement purposes.

72.     Replacement Bearings sold by OEMs are the same as the Bearings installed in industrial machinery and are made by the same manufacturer who made the Bearings originally installed – that is the purpose of an OEM part, made by the OEM supplier. The prices of replacement Bearings were inflated by Defendants' collusion.

73.     Plaintiff and members of the proposed Classes indirectly purchased Bearings, as stand-alone parts, for repair or replacement, and in industrial machinery containing Bearings.

74.     The Bearings market is dominated and controlled by a small number of manufacturers, which include Defendants.

**B.      The Structure and Characteristics of the Bearings Market Render the Conspiracy More Plausible.**

75.     The structure and other characteristics of the Bearings market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in these markets. Specifically, the Bearings market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

**1.      The Bearings Market Has High Barriers to Entry.**

76.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

CLASS ACTION COMPLAINT                                                                                      14

77.     There are substantial barriers that preclude, reduce, or make more difficult entry into the Bearings market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

78.     Research and development is necessary for product innovation because players in this industry compete primarily based on product pricing. To effectively compete, an entrant must be committed to spending a significant amount of resources on research and development.

79.     Defendants also own several patents for Bearings. These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

## 2.     There is Inelasticity of Demand for Bearings.

80.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

81.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

82.     Demand for Bearings is highly inelastic. This is because there are no close substitutes for these products. Additionally, customers must purchase Bearings as essential parts of industrial machinery, regardless of whether prices are kept at supra-competitive levels. Customers wanting to purchase industrial machinery simply have no choice but to purchase Bearings.

### 3. The Market for Bearings is Highly Concentrated.

83. A highly concentrated market is more susceptible to collusion and other anticompetitive practices. Defendants dominate the Bearings market.

### 4. Defendants Had Ample Opportunities to Conspire

84. Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy. According to one confidential witness who was the territory manager of a major Bearings manufacturer, employees of Defendants often ran into and spoke to one another at trade shows.

85. In addition, SKF, NSK, NTN, Koyo, Nachi and Schaeffler are six of the members of the seven-member World Bearing Association (the "WBA"). The WBA is not registered, not incorporated, has no Articles of Association, has no record of any meetings and does not file documents with any government entity globally.

86. Golf outings organized by distributors presented additional opportunities for employees of the defendant companies to conspire. It was not uncommon for the golf outings to draw more employees from bearings manufacturers than from distributors. Thus, manufacturers' employees had an opportunity to meet and were often paired together as part of the golf outing.

87. During such meetings or golf outings, Defendants and their co-conspirators had the opportunity to engage in private meetings, conversations and communications to discuss pricing and customer allocation for Bearings sold in the United States.

88. Defendants also had opportunities to conspire and trade information pursuant to the numerous acquisitions in the Bearings industry over the past five years. For example, the Timken Company announced at the end of 2009 that it sold its Needle Roller Bearings business to JTEKT.

89. On information and belief, Defendants also sell products, including Bearings, to one another as a general business practice. Defendants and their co-conspirators routinely produced and sold Bearings to each other. For example, at times, a particular manufacturer would shut down a product line (i.e., cease production of a particular size or type of bearing)

while maintaining the item on its price list. If a customer ordered a product that was no longer being produced, the nonproducing manufacturer would purchase it from a competitor. To facilitate such purchase and sales transactions, senior level employees, a General Manager or President of the Defendant manufacturer, would meet or communicate to discuss and finalize those arrangements. These transactions provided numerous additional opportunities for Defendants to collude on customer allocation and pricing structures in the U.S. Bearings market.

## C. **Government Investigations**

90.    Globally-coordinated Investigations into the bearings industry are underway in the United States, Canada, South Korea, Singapore, Australia, Japan, and Europe.

### DOJ Investigation

91.    In November 2011, the DOJ served a subpoena on NTN's "United States consolidated subsidiary requesting the submission of information related to transactions in bearings." NTN's 2012 report indicated that the U.S. investigation continues.

92.    Schaeffler similarly reported that it was a subject of the DOJ's bearings antitrust investigation.

93.    NSK's most recent quarterly report states that its subsidiary in the U.S. received a subpoena in connection with the DOJ's investigation.

94.    SKF's 2012 Annual Report indicates that it, too, is part of the DOJ's investigation.

### Investigation in Japan

95.    The JFTC launched an investigation in July 2011 after Defendant JTEKT sought leniency by alerting the regulatory agency of the Bearings conspiracy. JTEKT voluntarily confessed to the conspiracy and was exempted from a criminal complaint by the JFTC.

96.    On July 26, 2011, the JFTC conducted on-site inspections of Defendants NSK, NTN, JTEKT and Nachi-Fujikoshi amid suspicions that the companies violated Japan's antimonopoly law and fixed prices.

97.    In its 2011 Annual Report, NSK stated that it "intend[ed] to cooperate fully with the [JFTC] investigation" after acknowledging that "in July 2011 the Japan Fair Trade

17

1   commission conducted on-site investigations of NSK on suspicion that sales of certain products

2   infringed upon Japan's Antimonopoly Act."

3        98.    NTN reported in its 2011 Financial Report that it underwent an on-site inspection

4   by the Japan Fair Trade Commission concerning its bearings sales, on suspicion that the

5   Company had decided to raise sale prices in cooperation with other manufacturers, and that in

6   April this year a search was carried out by special investigators from Tokyo District Public

7   Prosecutor's Office and the Fair Trade Commission.

8        99.    A press release on JTEKT's website states that it too was inspected by the Tokyo

9   District Public Prosecutor's Office on April 20, 2012.

10       100.   The Japan Times also has reported that certain NTN officials have made

11   statements admitting to their participation in the conspiracy to fix prices on bearings during

12   voluntary questioning by Japanese prosecutors. Officials of NSK, JTEKT and Nachi-Fujikoshi

13   have already admitted to their roles in the conspiracy.

14       101.   According to sources, the JFTC said it "believes the culture of collusion is

15   ingrained in the bearing industry." In 1973, the JFTC similarly found that NSK, Koyo Seiko Co.

16   (currently JTEKT), Nachi-Fujikoshi and NTN Toyo Bearing Co. (currently NTN) formed a cartel

17   and held secret meetings at which they fixed bearings prices. In 2002, the French Conseil de la

18   Concurrence (Competition Council) fined four bearings manufacturers €19 million for their

19   participation in a price-fixing cartel that was active from 1993 through 1997. The cartel included

20   three participants in the present Bearings price-fixing cartel, Defendants SKF, Schaeffler and

21   NSK.

22       102.   In the mid 1980's, the Japanese Defendants regularly colluded to fix sale prices for

23   bearings. During this time the executives of the Japanese Defendants engaged in telephone

24   conferences to discuss pricing for customers and markets.

25       103.   The Japanese Defendants had agreements not to compete for their customers.

26   Their sales employees were not allowed to take customers from the other Japanese Defendants. If

27   there was an issue about prices and customers, the supervisors of the Japanese Defendants would

28

1  meet to determine who from their group would sell to a given customer and what price would be
2  charged for the sale.

3      104.   On June 14, 2012, the Japan Fair Trade Commission ("JFTC") filed a criminal
4  accusation that found a criminal violation of the Japan's Antimonopoly Act against NSK Ltd,
5  NTN Corp., and Nachi-Fujikoshi Corp.

6      **EC Investigation**

7      105.   On November 8, 2011, the European Commission ("EC") announced that it had
8  made unannounced inspections at the premises of companies that manufacture bearings for
9  industrial and other uses over concerns that these companies may have violated antitrust rules.
10  JTEKT stated in the 2012 Annual Report that they are under investigation in the EU for allegedly
11  contravening EU law. Nachi has also admitted in its 2011 report that in November of 2011 its
12  European subsidiary was inspected by the EC, in connection with investigations into its violation
13  of EC competition law. NTN's report also stated that its European subsidiary was subject to an
14  on-site inspection in November 2011 by the EC. NSK's report for the Quarter ending on June 30,
15  2013 states that NSK's subsidiary in Germany was investigated in November 2011 in relation to
16  the EC's investigation into anticompetitive conduct in the bearings industry.

17      106.   Defendants SKF and Schaeffler have admitted that their facilities were inspected
18  by the EC.

19      107.   In its 2011 Annual Report, SKF explained that, along with other companies in the
20  Bearing industry, it is "part of an investigation by the European Commission regarding a possible
21  violation of EU antitrust rules." SKF has also acknowledged that EU officials have visited its
22  Gothenburg, Sweden and Schweinfurt, Germany facilities. SKF's 2012 Annual Report stated it
23  was likely that the EC would impose a fine on it.

24      108.   Schaeffler AG's 2011 Annual Report acknowledges the worldwide Bearings
25  antitrust investigation, noting, "[t]he European Commission as well as the US Department of
26  Justice have commenced antitrust investigations of various manufacturers of rolling bearings,
27  including Schaeffer. The European and the U.S. competition authorities are investigating whether
28  manufacturers of rolling bearings participated in unlawful agreements and/or concerted practices

CLASS ACTION COMPLAINT                        19

concerning rolling or plain bearings." Schaeffler has also stated that "Several antitrust authorities have commenced investigations of several manufacturers" of bearings.

109. Schaeffler's 2012 report states that "The EU antitrust authorities are conducting further close examinations; the Schaeffler Group expects further steps in the proceedings in 2013."

### Investigations in South Korea, Singapore, and Australia

110. NTN's 2012 Annual Report also indicated that in July 2012 the Korean Fair Trade Commission conducted an on-site investigation of an NTN subsidiary, in connection with the investigation into the bearings conspiracy. NSK's most recent quarterly report states that in July 2012, its Korean subsidiary underwent an on-site inspection from the Korea Fair Trade Commission on suspicion of a violation of the Monopoly Regulation and Fair Trade Act in connection with the bearings business. SKF's 2012 report states that it is also being investigated by the Korean Fair Trade Commission.

111. A message on NTN's website states that the company's Singapore subsidiary underwent an on-site investigation in the fiscal year ending on March 31, 2013, as part of the bearings investigation by Singapore authorities. NSK's report for the quarter ending on June 30, 2013, stated that in February 2013, its subsidiary in Singapore was investigated by that company's competition commission.

112. On July 15, 2013, the Australian Competition and Consumer Commission ("ACCC") announced it had instituted civil proceedings in the Australian Federal Court against Koyo Australia Pty Ltd. (Koyo) – sister company of Defendant Koyo - for alleged cartel conduct relating to the supply of ball and roller bearings. The ACCC alleges that Koyo and at least two of its competitors made and gave effect to cartel arrangements for an increase to the price of bearings.

### D. Government Fines and Criminal Convictions

113. Nachi's 2012 Business Report confirms that on December 28, 2012, Nachi and two of its executives were convicted in Tokyo District Court of violating Japan's Antimonopoly Act. Keiichi Ogino, a former member of the board of directors, was sentenced to fourteen months

CLASS ACTION COMPLAINT

20

1   in prison and suspended for three years, and Michio Murai, a former deputy chief of the bearings

2   division, was sentenced to twelve months and also suspended for three years. The Tokyo District

3   Court also issued a 180 million yen criminal fine against Nachi-Fujikoshi.

4         114.    On February 25, 2013, Defendant NSK Ltd. announced that the company was

5   sentenced to a penalty of 380 million yen by the Tokyo District Court for violation of the

6   Antimonopoly Act of Japan as a result of the June 14, 2012 prosecution by the Tokyo District

7   Public Prosecutors Office. In addition, two of NSK's former officers and a former employee

8   received suspended sentences. Keisuke Takagawa and Katsumi Kuwabara, former senior vice

9   presidents, were sentenced to fourteen months in prison, while Yoshi Nishiyama was sentenced to

10   twelve months.

11         115.    On February 25, 2013, Nikkei Japan Business Newspaper reported that the

12   presiding judge stated, "[t]he crime is malicious – large in scope and carried out systematically.

13   Having the largest market share, NSK carried out the central role in this cartel."

14         116.    On March 29, 2013 the JFTC issued Cease and Desist Orders against NTN Corp.,

15   NSK, Ltd. and Nachi-Fujikoshi Corp, based on their violation of the Antimonopoly Act, through

16   participation in a conspiracy to fix the prices of Bearings. All three companies were required to

17   pay fines totaling ¥13.36 billion.

18         117.    JTEKT was also mentioned as a violator, but was not subject to a fine or cease and

19   desist order, due to its leniency status.

20         118.    JTEKT announced on July 13, 2013, that on July 12, 2013, it was ordered by the

21   Quebec Superior Court of Justice to pay a $5 million fine for violating the Canadian Competition

22   Act. It stated that it cooperated with the Canadian Competition Bureau and negotiated a plea

23   agreement with the Bureau.

24         119.    The Canadian Competition Bureau's press release regarding the fine stated that

25   "The Bureau became aware of the bearings cartel by way of its Immunity Program. Under the

26   Immunity Program, the first party to disclose to the Bureau an offence not yet detected or to

27   provide evidence leading to a referral of evidence to the Public Prosecution Service of Canada

28   (PPSC) may receive immunity from the PPSC, provided that it fully cooperates with the Bureau's

CLASS ACTION COMPLAINT                  21

investigation and any ensuing prosecution. Subsequent cooperating parties may receive lenient treatment under the Bureau's Leniency Program. These programs provide powerful incentives for organizations and individuals to come forward and cooperate with the Bureau's investigations. JTEKT participated in the Bureau's Leniency Program and provided substantial assistance to the Bureau and the PPSC.

### E.     Likely Existence of an Amnesty Applicant

120.     The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the Department of Justice. In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party who has been accepted into the DOJ's ACPERA program as an amnesty applicant. One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that the applicant is not charged with a criminal offense and is not required to plead guilty to criminal charges.

121.     In light of the multiple guilty pleas, the DOJ's ongoing investigation into the bearings industry, the fine paid in Canada by JTEKT (as well as JTEKT's admission of its participation in the price-fixing conspiracy), and the existence of an amnesty applicant in the JFTC proceedings, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

### F.     Damage to Plaintiff and Class Members Caused by Defendants' Illegal Activities.

122.     Defendants' conspiracy resulted in Defendants charging inflated prices to firms who directly purchased Bearings from them and in those purchasers raising their prices to subsequent purchasers.

123.     Having paid higher prices for components of the industrial machinery they sold to Plaintiff and the Classes and the Bearings they sold to Plaintiff and the Classes, firms who sold such Bearings and industrial machinery passed Defendants' overcharges on to Plaintiff and the Classes.

124.     Plaintiff and the Classes are entitled to the overcharges they paid for Bearings.

CLASS ACTION COMPLAINT

22

1      125.   Plaintiff has standing and has suffered damage compensable by indirect purchaser

2  laws and it and members of the classes it seeks to represent have sustained significant damage

3  and injury as a result of Defendants' conspiracy.

4                     **CLASS ACTION ALLEGATIONS**

5      126.   Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a)

6  and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on

7  behalf of the following class (the "Nationwide Class"):

8
9
10
11

> All industrial bearing purchasers that during the Class Period, purchased indirectly and for business use, (a) Bearings manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) new industrial machinery containing Bearings manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

12      127.   Plaintiff also brings this action on behalf of itself and as a class action under Rule

13  23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the

14  antitrust, unfair competition, unjust enrichment and consumer protection laws of the states whose

15  laws are set forth in the Second and Third Claims below, as well as the unjust enrichment laws of

16  Missouri, Massachusetts and Illinois. The states whose laws are set forth in the Second and Third

17  Claims below, as well as Missouri, Massachusetts and Illinois, are collectively referred to as the

18  "Indirect Purchaser States." These claims are brought by Plaintiff on behalf of itself and entities

19  in the Indirect Purchaser States listed in the Second, Third and Fourth Claims as follows (the

20  "Damages Class"):

21
22
23
24

> All industrial bearing purchasers in the Indirect Purchaser States that, during the Class Period purchased indirectly and for business use, (a) Bearings manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or (b) new industrial machinery containing Bearings manufactured by one of the Defendants or any current or former subsidiary, affiliate or co-conspirator thereof.

25
26
27

      128.   The Nationwide Class and the Damages Class are referred to herein as the

"Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and

28

CLASS ACTION COMPLAINT                                      23

1     affiliates, any co-conspirators, federal governmental entities, and instrumentalities of the federal

2     government, states, and their subdivisions, agencies, and instrumentalities.

3         129.    Although Plaintiff does not know the exact number of the members of the Classes,

4     Plaintiff believes there are at least thousands of members in each Class.

5         130.    Common questions of law and fact exist as to all members of the Classes. This is

6     particularly true given the nature of Defendants' conspiracy, which was generally applicable to all

7     the members of both Classes, thereby making appropriate relief with respect to the Classes as a

8     whole. Such questions of law and fact common to the Classes include, but are not limited to:

9
10          (a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Bearings sold in the United States;

11          (b)    The identity of the participants of the alleged conspiracy;

12          (c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;
13

14          (d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

15          (e)    Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the
16                Second and Third Claims for Relief;

17          (f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the
18                members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;
19

20          (g)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Classes;
21

22          (h)    The effect of the alleged conspiracy on the prices of Bearings sold in the United States during the Class Period;

23          (i)    Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiff and the members of the
24                Classes;

25          (j)    The appropriate injunctive and related equitable relief for the Nationwide Class; and
26

27          (k)    The appropriate class-wide measure of damages for the Damages Class.

28

131.   Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct because they paid artificially inflated prices for Bearings purchased indirectly from Defendants or their co-conspirators.

132.   Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

133.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

134.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism provide injured entities with a method for obtaining redress for claims that might not be practicable to pursue individually and substantially outweigh any difficulties that may arise in the management of this class action.

135.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFF AND THE CLASSES SUFFERED ANTITRUST INJURY

136.   Defendants' price-fixing conspiracy had the following effects, among others:

(a)   Price competition has been restrained or eliminated with respect to Bearings;

(b)   The prices of Bearings have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Defendants charged purchasers of their Bearings inflated, fixed and stabilized prices for such Bearings;

(d)     Firms who sold Defendants' Bearings and industrial machinery to Plaintiff and the Classes passed Defendants' overcharges on to them;

(e)     Defendants' overcharges passed through each level of distribution as they traveled to Plaintiff and the Classes; and

(f)     Plaintiff and members of the classes who bought Bearings and industrial machinery containing Bearings have been deprived of free and open competition and have paid inflated prices for Bearings.

137.    During the Class Period, Plaintiff and the members of the Classes paid supracompetitive prices for Bearings, as a result of Defendants' conspiracy.

138.    An increase in the prices of Bearings caused an increase in the price of industrial machinery during the Class Period.

139.    The market for Bearings and the market for industrial machinery are inextricably linked and intertwined because the market for Bearings exists to serve the industrial machinery market. Without the industrial machinery, the Bearings have little value because they have no independent utility and must be inserted into industrial machinery to serve any function. Indeed, the demand for industrial machinery creates the demand for Bearings.

140.    Bearings are identifiable, discrete physical products that remain essentially unchanged when incorporated into industrial machinery and are not altered during the manufacturing process. As a result, Bearings follow a traceable physical chain of distribution from the Defendants to Plaintiff and the members of the Classes, and any costs attributable to Bearings can be traced through the chain of distribution to Plaintiff and the members of the Classes.

141.    Just as Bearings can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Bearings affect prices paid by indirect purchasers of new industrial machinery containing Bearings.

142.    Bearings have their own part numbers, which permit them to be tracked.

143. Bearings are pieces of sophisticated equipment that are necessary to operate industrial machinery.

144. Bearings are commonly found in all types of industrial machinery and can be removed from a piece of industrial machinery and replaced.

145. The Bearings subject to Defendants' conspiracy and at issue in this lawsuit only have one use: to be inserted into industrial machinery.

146. Bearings comprise a not insignificant portion of the cost of industrial machinery.

147. The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig, or stabilize the price of Bearings and, as a direct and foreseeable result, the price of new industrial machinery containing Bearings and the price of Bearings purchased for repair purposes. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis—called regression analysis—is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product or service that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of Bearings on prices for new industrial machinery even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Bearings affects changes in the price of new industrial machinery. In such models, the price of Bearings would be treated as an independent or explanatory variable. The model can isolate how changes in the price of Bearings impact the price of new industrial machinery containing Bearings while controlling for the impact of other price-determining factors.

148. The precise amount of the overcharge impacting the prices of new industrial machinery containing Bearings can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiff and members of the Classes can be quantified.

27

149.    By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Bearings than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent and Plaintiff's and class members' damages are measureable.

## PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.    The Statute of Limitations Did Not Begin to Run Because Plaintiff Did Not and Could Not Discover the Claims

150.    Plaintiff repeats and realleges the allegations set forth above.

151.    Plaintiff and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until the public announcements of the government investigations into Bearings price-fixing began in July 2011.

152.    Plaintiff and the members of the Classes purchased industrial machinery or purchased Bearings to replace or repair damaged or defective Bearings.

153.    No information in the public domain was available to the Plaintiff and the members of the Classes prior to the public announcements of the government investigations beginning in July 2011 that revealed sufficient information to suggest that any one of the Defendants was involved in a criminal conspiracy to price-fix for Bearings. Plaintiff and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein.

154.    For these reasons, the statute of limitations as to Plaintiff's and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiff and the members of the Classes have alleged in this Complaint.

//

//

CLASS ACTION COMPLAINT

28

**B.    Fraudulent Concealment Tolled the Statute of Limitations**

155.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the Classes. Plaintiff and the members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the public announcement of the government investigations into Bearings price-fixing began.

156.    Because Defendants' agreements, understandings and conspiracies were kept secret until July 2011, Plaintiff and members of the Classes were unaware before that time of Defendants' unlawful conduct, and they did not know before then that they were paying supracompetitive prices for Bearings throughout the United States during the Class Period.

157.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

158.    Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss the price-fixing conduct in which they engaged to carry out their conspiracy.

159.    By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing. Bearings are not exempt from antitrust regulation, and thus, before July 2011, Plaintiff reasonably considered the Bearings industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Bearings prices before July 2011.

160.    Plaintiff and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy. For instance, Defendants met at remote locations and used code names to prevent discovery of their conspiracy.

161. Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until July 2011, when reports of the investigations into anticompetitive conduct concerning Bearings were first publicly disseminated.

162. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and the members of the Classes have alleged in this Complaint.

### FIRST CLAIM FOR RELIEF
#### Violation of Section 1 of the Sherman Act
#### (on behalf of Plaintiff and the Nationwide Class)

163. Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

164. The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

165. At least as early as January 1, 2000, and continuing until at least the filing of this Complaint, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Bearings, thereby creating anticompetitive effects.

166. The anticompetitive acts were intentionally directed at the United States market for Bearings and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Bearings throughout the United States.

167. The conspiratorial acts and combinations have caused unreasonable restraints in the market for Bearings.

168. As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated indirect purchasers in the Nationwide Class who purchased Bearings have been harmed by being forced to pay inflated, supracompetitive prices for Bearings and industrial machinery containing Bearings.

169. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

170. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for Bearings has been restrained, suppressed, and/or eliminated in the United States;

(b) Prices for Bearings sold by Defendants and their coconspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels throughout the United States;

(c) Prices for industrial machinery purchased by Plaintiff and the members of the Nationwide Class containing Bearings manufactured by Defendants and their coconspirators were inflated; and

(d) Plaintiff and members of the Nationwide Class who purchased Bearings indirectly from Defendants have been deprived of the benefits of free and open competition.

171. Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Bearings and industrial machinery containing Bearings than they would have paid and will pay in the absence of the conspiracy.

172. Plaintiff and members of the Nationwide Class will continue to be subject to Defendants' price-fixing which will deprive Plaintiff and members of the Nationwide Class of the benefits of free competition, including competitively-priced Bearings and industrial machinery containing Bearings.

173. Plaintiff and members of the Nationwide Class will continue to lose funds due to overpayment for Bearings and industrial machinery containing Bearings because they are required to purchase industrial machinery and Bearings to continue to operate their businesses.

174. Plaintiff and members of the Nationwide Class continue to purchase industrial machinery and Bearings on a regular basis.

175. Industrial machinery and Bearings continue to be sold at inflated and supracompetitive prices.

176. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

177. Plaintiff and members of the Nationwide Class will be at the mercy of Defendants' unlawful conduct until the Court orders an injunction.

178. Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiff and the Damages Class)**

179. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

180. From as early as January 1, 2000 until at least the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Bearings in unreasonable restraint of trade and commerce and in violation of the various state antitrust statutes set forth below.

181. The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize and/or maintain artificially supracompetitive prices for Bearings, in the United States.

182. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Bearings at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to Bearings sold in the United States;

(b) participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

183. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices with respect to Bearings.

184. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

185. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

(a) Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings.

(b) During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d) By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

186. Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a) During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Bearings at supracompetitive levels.

CLASS ACTION COMPLAINT

33

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Bearings.

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of Bearings; and (2) Allocating among themselves the production of Bearings.

(d)     The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California: (1) Price competition in the sale of Bearings has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Bearings sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Bearings or industrial machinery containing Bearings manufactured by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property in that they paid more for Bearings than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

187.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Official Code §§ 28-4501, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout the District of Columbia;

CLASS ACTION COMPLAINT

34

(2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Bearings or industrial machinery in the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiff and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Bearings or industrial machinery in the District of Columbia, paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings, including in the District of Columbia.

(b)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

188.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

(a)     Defendants' unlawful conduct had the following effects: (1) Bearings' price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Bearings' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

189.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq.*

190.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Bearings

1  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa;

2  (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and

3  (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices

4  for Bearings and industrial machinery containing Bearings.

5      (b)     During the Class Period, Defendants' illegal conduct substantially affected Iowa

6  commerce.

7      (c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and

8  members of the Damages Class have been injured in their business and property and are

9  threatened with further injury.

10      (d)     By reason of the foregoing, Defendants have entered into agreements in restraint

11  of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiff and members of the

12  Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

13      191.     Defendants have entered into an unlawful agreement in restraint of trade in

14  violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

15      (b)     Defendants' combinations or conspiracies had the following effects: (1) Bearings

16  price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Bearings

17  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas;

18  (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and

19  (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices

20  for Bearings and industrial machinery containing Bearings.

21      (c)     During the Class Period, Defendants' illegal conduct substantially affected Kansas

22  commerce.

23      (d)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and

24  members of the Damages Class have been injured in their business and property and are

25  threatened with further injury.

26      (e)     By reason of the foregoing, Defendants have entered into agreements in restraint

27  of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiff and members

28  of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

CLASS ACTION COMPLAINT

192. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a) Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Maine; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiff and members of the Damages Class were deprived of free and open competition: and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings.

(b) During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c) As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d) By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10. §§ 1101, *et seq.*

193. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a) Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings.

(b) During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

194.    Defendants have entered into an unlawful agreement in unreasonable restraint of trade in violation of the Minnesota Statutes Annotated §§ 325D.49, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings.

(b)     During the Class Period Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

195.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

1  Mississippi; (3) Plaintiff and members of the Damages Class, including those who resided in

2  Mississippi and/or purchased Bearings or industrial machinery in Mississippi were deprived of

3  free and open competition, including in Mississippi: and (4) Plaintiff and members of the

4  Damages Class, including those who resided in Mississippi and/or purchased Bearings or

5  industrial machinery in Mississippi paid supracompetitive, artificially inflated prices for Bearings,

6  including in Mississippi.

7      (b)     During the Class Period, Defendants' illegal conduct substantially affected

8  Mississippi commerce.

9      (c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and

10  members of the Damages Class have been injured in their business and property and are

11  threatened with further injury.

12      (d)     By reason of the foregoing, Defendants have entered into agreements in restraint

13  of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiff and

14  members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1,

15  *et seq.*

16      196.    Defendants have entered into an unlawful agreement in restraint of trade in

17  violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

18      (a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings

19  price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Bearings

20  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

21  Nebraska; (3) Plaintiff and members of the Damages Class were deprived of free and open

22  competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive,

23  artificially inflated prices for Bearings and industrial machinery containing Bearings.

24      (b)     During the Class Period, Defendants' illegal conduct substantially affected

25  Nebraska commerce.

26      (c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and

27  members of the Damages Class have been injured in their business and property and are

28  threatened with further injury.

CLASS ACTION COMPLAINT

40

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

197.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiff and members of the Damages Class, including those who resided in Nevada and/or purchased Bearings or industrial machinery in Nevada, were deprived of free and open competition including in Nevada; and (4) Plaintiff and members of the Damages Class, including those who resided in Nevada and/or purchased Bearings or industrial machinery in Nevada, paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings, including in Nevada.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.060, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

198.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2)

CLASS ACTION COMPLAINT

41

Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings.

(b)     During the Class Period Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

199.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiff and

1    members of the Damages Class seek all relief available under New Mexico Stat. Ann.§§ 57-1-1,

2    *et seq.*

3        200.    Defendants have entered into an unlawful agreement in restraint of trade in

4    violation of the New York General Business Laws §§ 340, *et seq.*

5        (a)    Defendants' combinations or conspiracies had the following effects: (1) Bearings

6    price competition was restrained, suppressed, and eliminated throughout New York; (2) Bearings

7    prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New

8    York; (3) Plaintiff and members of the Damages Class, including those who resided in New York

9    and/or purchased Bearings or industrial machinery in New York, were deprived of free and open

10   competition, including in New York; and (4) Plaintiff and members of the Damages Class,

11   including those who resided in New York, paid supracompetitive, artificially inflated prices for

12   Bearings when they purchased, including in New York, Bearings or industrial machinery

13   containing Bearings, or purchased, including in New York, Bearings or industrial machinery that

14   were otherwise of lower quality, than would have been absent the conspirators' illegal acts, or

15   were unable to purchase Bearings or industrial machinery that they would have otherwise have

16   purchased absent the illegal conduct.

17       (b)    During the Class Period, Defendants' illegal conduct substantially affected New

18   York commerce.

19       (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and

20   members of the Damages Class have been injured in their business and property and are

21   threatened with further injury.

22       (d)    By reason of the foregoing, Defendants have entered into agreements in restraint

23   of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is

24   a per se violation of the Act. Accordingly, Plaintiff and members of the Damages Class seek all

25   relief available under New York Gen. Bus. Law §§ 340, *et seq.*

26       201.    Defendants have entered into an unlawful agreement in restraint of trade in

27   violation of the North Carolina General Statutes §§ 75-1, *et seq.*

28

CLASS ACTION COMPLAINT

43

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class, including those who resided in North Carolina and/or purchased Bearings or industrial machinery in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiff and members of the Damages Class, including those who resided in North Carolina and/or purchased Bearings or industrial machinery in North Carolina, paid supracompetitive, artificially inflated prices for Bearings and industrial machinery including in North Carolina.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(c)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

202.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

CLASS ACTION COMPLAINT

44

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

203.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)  Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings.

(b)  During the Class Period Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

204.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1., *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout South Dakota; (2)

Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and members of the Damages Class, including those who resided in South Dakota and/or purchased Bearings or industrial machinery in South Dakota, were deprived of free and open competition including in South Dakota; and (4) Plaintiff and members of the Damages Class, including those who resided in South Dakota and/or purchased industrial machinery or Bearings in South Dakota, paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings including in South Dakota.

(b)　During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)　As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)　By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

205.　Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

(a)　Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff and members of the Damages Class, including those who resided in Tennessee and/or purchased Bearings or industrial machinery in Tennessee, were deprived of free and open competition including in Tennessee; and (4) Plaintiff and members of the Damages Class, including those who resided in Tennessee, and/or purchased Bearings or industrial machinery in Tennessee, paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings including in Tennessee.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(c)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

206.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Utah; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

207.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the 9 Vermont Stat. Ann. §§ 2451, *et seq.*

1       (a)    Defendants' combinations or conspiracies had the following effects: (1) Bearings

2  price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Bearings

3  prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

4  Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open

5  competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive,

6  artificially inflated prices for Bearings and industrial machinery containing Bearings.

7       (b)    During the Class Period Defendants' illegal conduct had a substantial effect on

8  Vermont commerce.

9       (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and

10  members of the Damages Class have been injured in their business and property and are

11  threatened with further injury.

12       (d)    By reason of the foregoing, Defendants have entered into agreements in restraint

13  of trade in violation of 9 Vermont Stat. Ann. §§ 2451, *et seq.* Plaintiff is entitled to relief pursuant

14  to 9 Vermont Stat. Ann. § 2465 and any other applicable authority. Accordingly, Plaintiff and

15  members of the Damages Class seek all relief available under 9 Vermont Stat. Ann. §§ 2451, *et*

16  *seq.*

17     208.    Defendants have entered into an unlawful agreement in restraint of trade in

18  violation of the West Virginia Code §§ 47-18-1, *et seq.*

19       (a)    Defendants' combinations or conspiracies had the following effects: (1) Bearings

20  price competition was restrained, suppressed, and eliminated throughout West Virginia; (2)

21  Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

22  West Virginia; (3) Plaintiff and members of the Damages Class, including those who resided in

23  West Virginia and/or purchased Bearings or industrial machinery in West Virginia, were deprived

24  of free and open competition including in West Virginia; and (4) Plaintiff and members of the

25  Damages Class, including those who resided in West Virginia and/or purchased industrial

26  machinery or Bearings in West Virginia, paid supracompetitive, artificially inflated prices for

27  Bearings and industrial machinery containing Bearings including in West Virginia.

28

1    (b)    During the Class Period, Defendants' illegal conduct had a substantial effect on

2    West Virginia commerce.

3    (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and

4    members of the Damages Class have been injured in their business and property and are

5    threatened with further injury.

6    (d)    By reason of the foregoing, Defendants have entered into agreements in restraint

7    of trade in violation of West Virginia §§ 47-18-1, *et seq.* Accordingly, Plaintiff and members of

8    the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq.*

9    209.    Defendants have entered into an unlawful agreement in restraint of trade in

10   violation of the Wisconsin Statutes §§ 133.01, *et seq.*

11   (a)    Defendants' combinations or conspiracies had the following effects: (1) Bearings

12   price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Bearings

13   prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

14   Wisconsin; (3) Plaintiff and members of the Damages Class were deprived of free and open

15   competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive,

16   artificially inflated prices for Bearings and industrial machinery containing Bearings.

17   (b)    During the Class Period Defendants' illegal conduct had a substantial effect on

18   Wisconsin commerce.

19   (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and

20   members of the Damages Class have been injured in their business and property and are

21   threatened with further injury.

22   (d)    By reason of the foregoing, Defendants have entered into agreements in restraint

23   of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, Plaintiff and members of

24   the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

25   210.    Plaintiff and members of the Damages Class in each of the above states have been

26   injured in their business and property by reason of Defendants' unlawful combination, contract,

27   conspiracy, and agreement. Plaintiff and members of the Damages Class have paid more for

28   Bearings and industrial machinery containing Bearings than they otherwise would have paid in

CLASS ACTION COMPLAINT

49

the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

211. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiff and the members of the Damages Class.

212. Accordingly, Plaintiff and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**THIRD CLAIM FOR RELIEF**
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiff and the Damages Class)**

213. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

214. Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

215. Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101.

(a) Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Bearings were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Damages Class.

(b) The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c) Defendants' unlawful conduct had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Bearings prices

CLASS ACTION COMPLAINT

50

were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3)
Plaintiff and the members of the Damages Class were deprived of free and open competition; and
(4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated
prices for Bearings and industrial machinery containing Bearings.

(d)     During the Class Period, Defendants' illegal conduct substantially affected
Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants,
Plaintiff and the members of the Damages Class have been injured in their business and property
and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or
practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiff
and the members of the Damages Class seek all relief available under that statute.

216.    Defendants have engaged in unfair competition or unfair, unconscionable,
deceptive or fraudulent acts or practices in violation of California Business and Professions Code
§ 17200, et seq.

(a)     During the Class Period, Defendants marketed, sold, or distributed Bearings in
California, and committed and continue to commit acts of unfair competition, as defined by
Sections 17200, et seq. of the California Business and Professions Code, by engaging in the acts
and practices specified above.

(b)     During the Class Period, Defendants' illegal conduct substantially affected
California commerce and consumers.

(c)     This claim is instituted pursuant to Sections 17203 and 17204 of the California
Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged
herein, that violated Section 17200 of the California Business and Professions Code, commonly
known as the Unfair Competition Law.

(d)     The Defendants' conduct as alleged herein violated Section 17200. The acts,
omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein,
constituted a common, continuous, and continuing course of conduct of unfair competition by

CLASS ACTION COMPLAINT

51

1   means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of

2   California Business and Professions Code, Section 17200, *et seq.,* including, but not limited to,

3   the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the

4   violations of Section 16720, *et seq.,* of the California Business and Professions Code, set forth

5   above;

6       (e)     Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as

7   described above, whether or not in violation of Section 16720, *et seq.,* of the California Business

8   and Professions Code, and whether or not concerted or independent acts, are otherwise unfair,

9   unconscionable, unlawful or fraudulent;

10      (f)     Defendants' acts or practices are unfair to purchasers of Bearings (or industrial

11  machinery containing them) in the State of California within the meaning of Section 17200,

12  California Business and Professions Code; and

13      (g)     Defendants' unlawful conduct had the following effects: (1) Bearings price

14  competition was restrained, suppressed, and eliminated throughout California; (2) Bearings prices

15  were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3)

16  Plaintiff and members of the Damages Class, including those who resided in California and/ or

17  purchased Bearings or industrial machinery in California, were deprived of free and open

18  competition, including in California; and (4) Plaintiff and members of the Damages Class,

19  including those who resided in California and/or purchased Bearings or industrial machinery in

20  California, paid supracompetitive, artificially inflated prices for Bearings and industrial

21  machinery containing Bearings, including in California.

22      (h)     Defendants' acts and practices are unlawful, fraudulent or deceptive within the

23  meaning of Section 17200 of the California Business and Professions Code.

24      (i)     The illegal conduct alleged herein is continuing and there is no indication that

25  Defendants will not continue such activity into the future.

26      (j)     The unlawful, fraudulent, deceptive, and unfair business practices of Defendants,

27  and each of them, as described above, have caused and continue to cause Plaintiff and the

28  members of the Damages Class to pay supracompetitive and artificially-inflated prices for

CLASS ACTION COMPLAINT                                                                52

Bearings (or industrial machinery containing them). Plaintiff and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

217.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Bearings were sold, distributed, or obtained in the District of Columbia.

(b)     The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

(c)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers.

(d)     Plaintiff was not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Bearings. Defendants had the sole power to set that price and Plaintiff had no power to negotiate a lower price.

(e)     Moreover, Plaintiff lacked any meaningful choice in purchasing Bearings because it was unaware of the unlawful overcharge and because it had to purchase Bearings in order to be able to operate its industrial machinery.

(f)     Defendants' conduct with regard to sales of Bearings, including their illegal conspiracy to secretly fix the price of Bearings at supracompetitive levels and overcharge

purchasers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff.

       (g)     Defendants' unlawful conduct had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and the Damages Class were deprived of free and open competition; and (4) Plaintiff and the Damages Class paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings.

       (h)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiff and the members of the Damages Class and the prices paid by them for Bearings, due to the inflated prices paid by Plaintiff and Class members for industrial machinery and Bearings.

       (i)     As a direct and proximate result of the Defendants' conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

       218.    Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

       (a)     Defendants' unlawful conduct had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Florida; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings;

CLASS ACTION COMPLAINT

54

1    (b)    During the Class Period, Defendants' illegal conduct substantially affected Florida
2    commerce and consumers.

3    (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and
4    members of the Damages Class have been injured in their business and property and are
5    threatened with further injury.

6    (d)    Defendants have engaged in unfair competition or unlawful, unfair or deceptive
7    acts or practices in violation of Florida Stat. § 501.201, *et seq.,* and, accordingly, Plaintiff and
8    members of the Damages Class seek all relief available under that statute.

9    219.    Defendants have engaged in unfair competition or unfair, unconscionable, or
10   deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

11   (a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce by
12   affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels,
13   the prices at which Bearings were sold, distributed, or obtained in New Mexico and took efforts
14   to conceal their agreements from Plaintiff and members of the Damages Class.

15   (b)    Plaintiff was not aware of Defendants' price-fixing conspiracy and was therefore
16   unaware that it was being unfairly and illegally overcharged. There was a gross disparity of
17   bargaining power between the parties with respect to the price charged by Defendants for
18   Bearings. Defendants had the sole power to set that price and Plaintiff had no power to negotiate
19   a lower price. Moreover, Plaintiff lacked any meaningful choice in purchasing Bearings because
20   it was unaware of the unlawful overcharge and because it had to purchase Bearings in order to
21   be able to operate its industrial machinery. Defendants' conduct with regard to sales of
22   Bearings, including their illegal conspiracy to secretly fix the price of Bearings at
23   supracompetitive levels and overcharge consumers, was substantively unconscionable because it
24   was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public.
25   Defendants took grossly unfair advantage of Plaintiff.

26   (c)    The aforementioned conduct on the part of the Defendants constituted
27   "unconscionable trade practices," in violation of N.M.S.A.§ 57-12-3, in that such conduct, *inter*
28   *alia*, resulted in a gross disparity between the value received by Plaintiff and the members of the

CLASS ACTION COMPLAINT                                                                    55

Damages Class and the prices paid by them for Bearings as set forth in N.M.S.A. § 57-12-2E, due to the inflated prices paid by Plaintiff and Class members for industrial machinery and Bearings.

(d)     Defendants' unlawful conduct had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and the members of the Damages Class paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings.

(e)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(f)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

220.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Bearings were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Damages Class.

(b)     Defendants deceptively led purchasers, such as Plaintiff and Class members, to believe that the Bearings they had purchased as replacements and inside industrial machinery had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to them.

(c)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in

CLASS ACTION COMPLAINT

56

injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

     (d)    Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Bearings were misled to believe that they were paying a fair price for Bearings or the price increases for Bearings were for valid business reasons; and similarly situated purchasers were potentially affected by Defendants' conspiracy.

     (e)    Defendants' unlawful conduct had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout New York; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class, who resided in and/or made purchases of industrial machinery or Bearings in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiff and members of the Damages Class, who resided in and/or made purchases of industrial machinery or Bearings in New York, paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings, and were subjected to Defendants' deceptive practices.

     (f)    Defendants knew that their unlawful trade practices with respect to pricing Bearings would have an impact on all purchasers in New York and not just the Defendants' direct customers.

     (g)    Defendants knew that their unlawful trade practices with respect to pricing Bearings would have a broad impact, causing class members who indirectly purchased Bearings to be injured by paying more for Bearings than they would have paid in the absence of Defendants' unlawful trade acts and practices.

     (h)    During the Class Period, Defendants marketed, sold, or distributed Bearings in New York and their illegal conduct substantially affected New York commerce and New York purchasers.

(i)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled manufactured, sold, and/or distributed Bearings in New York.

(j)     Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

221.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

(a)     Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Bearings were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Damages Class.

(b)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in injuries to purchasers of Bearings and industrial machinery, and broad adverse impact on the public at large, and harmed the public interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)     Defendants' unlawful conduct had the following effects upon purchasers of Bearings in North Carolina: (1) Bearings price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class, including those who resided in North Carolina and/or purchased Bearings or industrial machinery in North Carolina, were deprived of free and open competition including in North Carolina; and (4) Plaintiff and members of the Damages Class, including those who resided in North Carolina and/or purchased Bearings or industrial machinery in North Carolina, paid supracompetitive, artificially inflated prices for Bearings and industrial machinery containing Bearings including in North Carolina.

(d)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and purchasers of Bearings and industrial machinery.

1    Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by

2    Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation

3    and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently

4    deceptive and self-concealing actions, of which Plaintiff could not possibly have been aware.

5    Moreover, Defendants deceptively concealed their unlawful activities by conducting meetings

6    and conversations in secret.

7         (e)    During the Class Period, each of the Defendants named herein, directly, or

8    indirectly and through affiliates they dominated and controlled, manufactured, marketed, sold

9    and/or distributed Bearings in North Carolina.

10        (f)    Plaintiff and members of the Damages Class seek actual damages for their injuries

11   caused by these violations in an amount to be determined at trial and are threatened with further

12   injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

13   violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiff and members

14   of the Damages Class seek all relief available under that statute.

15        222.   Defendants have engaged in unfair competition or unfair, unconscionable, or

16   deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code

17   Ann. §§ 39-5-10, *et seq.*

18        (a)    Defendants' combinations or conspiracies had the following effects: (1) Bearings

19   price competition was restrained, suppressed, and eliminated throughout South Carolina; (2)

20   Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

21   South Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open

22   competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive,

23   artificially inflated prices for Bearings and industrial machinery containing Bearings.

24        (b)    During the Class Period, Defendants' illegal conduct had a substantial effect on

25   South Carolina commerce.

26        (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and

27   members of the Damages Class have been injured in their business and property and are

28   threatened with further injury.

CLASS ACTION COMPLAINT

59

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.,* and, accordingly, Plaintiff and the members of the Damages Class seek all relief available under that statute.

223.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Bearings were sold, distributed, or obtained in Vermont.

(b)     Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Bearings. Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' Bearings prices were competitive and fair.

(c)     Defendants' unlawful conduct had the following effects: (1) Bearings price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Bearings prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Bearings and industrial machinery containing Bearings.

(d)     As a direct and proximate result of the Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(e)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Bearings, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Bearings at prices set by a free and fair

1  market. Defendants' misleading conduct and unconscionable activities constitute unfair

2  competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and,

3  accordingly, Plaintiff and members of the Damages Class seek all relief available under that

4  statute.

5
**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(on behalf of Plaintiff and the Damages Class)**

6      224.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

7      225.   Plaintiff brings this claim under the laws of all states listed in the Second and

8  Third Claims, *supra*. Plaintiff also brings this claim under the laws of Missouri, Massachusetts

9  and Illinois on behalf of the class members in those three states.

10      226.   As a result of their unlawful conduct described above, Defendants have and will

11  continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a

12  minimum, unlawfully inflated prices and unlawful profits on sales of Bearings.

13      227.   Defendants have benefited from their unlawful acts and it would be inequitable for

14  Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments

15  made by Plaintiff or the members of the Damages Class for Bearings or industrial machinery

16  containing Bearings.

17      228.   Plaintiff and the members of the Damages Class are entitled to the amount of

18  Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.

19  Plaintiff and the members of the Damages Class are entitled to the establishment of a constructive

20  trust consisting of all ill-gotten gains from which Plaintiff and the members of the Damages Class

21  may make claims on a pro rata basis.

22      229.   Pursuit of any remedies against the firms from whom Plaintiff and the Class

23  members purchased industrial machinery containing Bearings and Bearings subject to

24  Defendants' conspiracy would have been futile, given that those firms did not take part in

25  Defendants' conspiracy.

26  //

27  //

28

CLASS ACTION COMPLAINT                                                61

## PRAYER FOR RELIEF

Accordingly, Plaintiff respectfully requests that:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.     The unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)     A *per se* violation of Section 1 of the Sherman Act;

(c)     An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d)     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiff and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     Plaintiff and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device

CLASS ACTION COMPLAINT

62

1    having a similar purpose or effect;

2        F.    Plaintiff and the members of the Damages Class be awarded restitution, including

3    disgorgement of profits Defendants obtained as a result of their acts of unfair competition and

4    acts of unjust enrichment;

5        G.    Plaintiff and the members of the Classes be awarded pre- and post- judgment

6    interest as provided by law, and that such interest be awarded at the highest legal rate from and

7    after the date of service of this Complaint;

8        H.    Plaintiff and the members of the Classes recover their costs of suit, including

9    reasonable attorneys' fees, as provided by law; and

10       I.    Plaintiff and members of the Classes have such other and further relief as the case

11   may require and the Court may deem just and proper.

12                                    **JURY DEMAND**

13       Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

14   Procedure, of all issues so triable.

15       Dated: January 8, 2014.

                                          Respectfully submitted,
16

17

18                                        Ben F. Pierce Gore (SBN 128515)
                                          PRATT & ASSOCIATES
19                                        1871 The Alameda, Suite 425
                                          San Jose, CA 95126
20                                        Telephone: (408) 429-6506
                                          pgore@prattattorneys.com
21

22                                        Jonathan W. Cuneo
                                          Joel Davidow
23                                        Daniel Cohen
                                          Victoria Romanenko
24                                        CUNEO GILBERT & LADUCA, LLP
                                          507 C Street, N.E.
25                                        Washington, DC 20002
                                          Telephone: (202) 789-3960
26                                        jonc@cuneolaw.com
                                          joel@cuneolaw.com
27                                        danielc@cuneolaw.com
                                          vicky@cuneolaw.com
28

CLASS ACTION COMPLAINT                                                    63

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Michael J. Flannery
CUNEO GILBERT & LADUCA, LLP
300 North Tucker
Suite 801
St. Louis, MO 63101
Telephone: (314) 226-1015
mflannery@cuneolaw.com

Shawn M. Raiter
Paul A. Sand
LARSON • KING, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone: (651) 312-6500
sraiter@larsonking.com
psand@larsonking.com

Don Barrett
Brian Herrington
David McMullan
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Richard R. Barrett
LAW OFFICES OF RICHARD R. BARRETT,
PLLC
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: (662) 380-5018
rrb@rrblawfirm.net
Charles Barrett
CHARLES BARRETT, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
charles@cfbfirm.com

Gerard V. Mantese
David Hansma
Brendan Frey
MANTESE HONIGMAN ROSSMAN AND
WILLIAMSON, P.C.
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 457-9200
gmantese@manteselaw.com
dhansma@manteselaw.com
bfrey@manteselaw.com

Thomas P. Thrash
Marcus N. Bozeman
THRASH LAW FIRM, P.A.
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net
bozemanmarcus@sbcglobal.net

Gregory Johnson
G. JOHNSON LAW, PLLC
6688 145th Street West,
Apple Valley, MN 55124
Telephone: (952) 930-2485
greg@gjohnsonlegal.com

Dewitt Lovelace
Valerie Nettles
LOVELACE & ASSOCIATES, P.A.
12870 U.S. Hwy. 98 West
Suite 200
Miramar Beach, FL 32550
Telephone: (850) 837-6020
dml@lovelacelaw.com
valerie@lovelacelaw.com

CLASS ACTION COMPLAINT